FILED

MAR 2 6 2003

LARRY W. PROPES, CLERK
U. S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

BASF Coatings S.p.A. (formerly SALCHI )
S.p.A.), )
)
)
Plaintiff, )
vs. )
)
Crown Metro Specialty Products, Inc., )
)
Defendant. )

C.A. No.: 6:03-??/CV 35

COMPLAINT

The Plaintiff, BASF Coatings S.p.A., ("BASF"), formerly SALCHI, S.p.A., through its

attorneys, complaining of the above-named Defendant, Crown Metro Specialty Products, Inc.,

("Crown Metro") would respectfully show unto the Court:

## JURISDICTION AND PARTIES

1.     The Plaintiff, BASF is a corporation organized and existing pursuant to the laws

of the country of Italy and has a principal place of business in Burago Molgora, Italy.

2.     Upon information and belief, the Defendant, Crown Metro, is a corporation

organized and existing under the laws of one of the United States with its principal place of

business in the County of Greenville, South Carolina.

3.     Federal question subject matter jurisdiction is conferred upon this Court by 28

U.S.C.S. § 1331.   Specifically, this case involves the application of the United Nations

Convention on the Recognition of Foreign Arbitral Awards, codified at 9 U.S.C.S. §§ 203 and

207.

# INTERNATIONAL COURT OF ARBITRATION
# COUR INTERNATIONALE D'ARBITRAGE

## CASE No. 10321/AER/ACS

### BASF COATINGS S.P.A. (formerly SALCHI SPA)
### (Italy)

**vs/**

### CROWN METRO SPECIALITY PRODUCTS INC.
### (U.S.A.)

This document is an original of the Award rendered in conformity with the Rules of the ICC International Court of Arbitration

*******

Ce document set un original de la Sentence rendue conformément au Règlement de la Cour Internationale de la CCI

## International Chamber of Commerce

## INTERNATIONAL COURT OF ARBITRATION
### (Case no. 10321/AER/ACS)

---

### AWARD SENTENCE

rendered, in conformity with the ICC Rules of arbitration in force commencing from 1 January 1998,

by the sole arbitrator Franco Brusa, lawyer, Via G.B. Pioda no. 5, 6901, Lugano (Switzerland) appointed by the International Court of Arbitration on 2 June 1999,

in the arbitration proceeding

**BASF Coatings S.p.A.** (formerly "Salchi S.p.A.") with registered office in Via S. Maria Molgora no. 15, Burago Molgora (Italy) (represented in this proceeding by the lawyers Giovanni Izzi, Michele Toniatti, of the law firm Izzi-Salaroli e Associati, Piazza San Babila 4/A, 20122 Milan, and the lawyer Paola Masoni, of the law firm Valeria e Franco Masoni-Fontana, Via C.Frasca no. 10, 6901, Lugano, Switzerland)

<u>claimant</u>

versus

**Crown Metro Speciality Products Inc.,** with registered office in Echelon Road, Donaldson Center, Greenville (U.S.A.) (represented in this proceeding by the lawyer Knox L. Haynsworth, III, of the law firm Brown, Massey, Evans, McLeod & Haynsworth, 106 Williams Street, Greenville, South Carolina 29602, U.S.A. and by the lawyer Beat Mumenthaler, of the law firm Python Schifferli Peter & Associés, rue Massot 9, 1206, Geneva, Switzerland)

<u>respondent</u>

# I    SUMMARY OF THE FACTS

1.1    The claimant Basf Coatings SpA (hereinafter "Basf"), formerly called Salchi Spa, entered into a manufacturing and sale license agreement, on 1 January 1996, known as the "Technical Service and License Agreement", with the respondent Crown Metro Speciality Product, Inc. (hereinafter "Crown") (document no. 1).

1.2    By way of this agreement Basf granted Crown a manufacturing and sales license in relation to the products and the corresponding know-how, as described in Exhibit A to the agreement.

2.    In fact the parties had previously maintained commercial relations.
     In particular, Basf (then Salchi) had:

- granted its know-how rights to a company named Nova Industries, from 24 January 1984 to 25 May 1987;
- entered into a second license agreement with the latter and with another company named C-N Financial Group, with effect from 26 May 1987 and a duration of 10 years.

Following changes to the company structures of the licensees during 1991, the sole licensee in respect of such agreements was the respondent Crown;

3.    Pursuant to clause 3.1 of the license agreement dated 1 January 1996 (hereinafter the "new license agreement") Crown undertook to pay Basf royalties equal to 3% of the net value of sales of the licensed products (see document no.1). The new license agreement however provided for minimum royalties, listed under clause 3.3, to be paid at the due dates indicated therein. The terms for payment of the royalties due pursuant to clause 3.1 were specified under clause 3.5 of the new license agreement, which clause also indicated how the minimum royalties described under clause 3.3 were to be calculated.

4.1    Between 6 July 1996 and 9 July 1998 Basf issued 8 invoices (documents 8-15) for payment of royalties calculated on the basis of reports sent by Crown and concerning sales effected

during the first quarter of 1996 and the second quarter of 1997 (documents 2-7), in relation to payment of minimum royalties for the period up until 31 December 1998.

An overall amount of US$ 146,294.89 is still outstanding in relation to such invoices; US$ 81,484.89 concerns royalties due on the basis of sales effected, US$ 64,810.00 concerns the so-called minimum royalties.

4.2    During this arbitration proceeding Basf has, commencing from 31 March 2000, issued a further 5 invoices for payment of the minimum royalties for the period from 1 January 1999 to 31 December 2002, for a total of US$ 260,000.00. All of these invoices have remained unpaid in full.

4.3    The total of Basf's claimable credits under the outstanding invoices amounts to US$ 406,294.89.

5.1    Despite invitations to pay the outstanding invoices described above under paragraph 4.3 (documents 16-18), the latter have never been paid by the respondent, who has disputed the accuracy thereof, declaring that following problems with the licensed products and consequent demands for compensation by buyers, the calculations relative to royalties should have been modified (document C).

5.2    The respondent has also refused to pay invoices issued during the course of this proceeding (see paragraph 4.2 above), claiming that the new license agreement was terminated by Basf during 1998, at the latest by way of commencement of this arbitration proceeding (2 December 1998) and in any case by way of receipt by Basf of the termination notice formulated by Crown in January 2001. The latter also enforced its right to set-off its credits, which are greater than credits claimed by the claimant.

6.    On 2 December 1998, the claimant made a Request for arbitration before the International Court of Arbitration of the International Chamber of Commerce, in relation to the credits under the invoices described under paragraph 4.1 above. On 22 June 2000 the claimant made a second Request for arbitration before the same Court in relation to the credits under the invoices described under paragraph 4.2 above. In both cases the claimant based its request for arbitration on clause 9.4 of the new license agreement, which contains an arbitration clause, according to which any disputes or claims deriving from or connected to

such agreement shall be resolved by way of arbitration in conformity with the Rules of the ICC International Court of Arbitration.

## II    SUMMARY DESCRIPTION OF THE PARTIES' ALLEGATIONS

7    Respondent's allegations

7.1    The respondent does not deny the existence of the new license agreement (document 1) or the fact that royalties are due for the period up to 2 December 1998.

However, having initially contested the fact that the latter were due in the amount requested by the claimant, since numerous invoices on the basis of which the royalties were calculated were subsequently subject to reductions, pursuant to which the amount of royalties should also have at least been reduced, the respondent requested that such amounts be set-off with its credits for a greater amount.

Royalties due for the period commencing from 3 December 1998 are however disputed in full, since by way of commencement of this arbitration proceeding by Basf on 2 December 1998, the latter allegedly terminated the new license agreement and the respondent no longer requested or obtained formulas, technical assistance or products from the claimant, and no longer produced the paints with the use of formulas provided by the latter.

7.2    The respondent has enforced a series of credit claims, which it holds should be set-off with all royalties, both those recognized and those possibly due, for the following reasons:

i)    the claimant allegedly failed to perform its obligations under the new license agreement, refusing to sell resin based products and to communicate and transfer the know-how related to such products to the respondent;

ii)    the respondent is entitled to receive from the claimant a commission equal to 10% of royalties received by the claimant for products the object of the new license agreement, on the basis of similar agreements with third parties in Canada and Mexico, as agreed in Exhibit A to the new license agreement;

iii)    the license agreement which was entered into with effect from 26 May 1987 (document B) was not annulled and substituted by the new license agreement.

It therefore continued to take effect and in particular the claimant allegedly continues to be obliged to provide the respondent with all technologies and products for wood and wooden furniture.  The claimant refused to deliver to the respondent certain technologies concerning water-based paints for wood and the corresponding know-how, therefore causing damage to the respondent;

iv)    the claimant agreed with the respondent that it would supply the latter with products and know-how relative to certain low cost polyurethane products, including those sold by Mr. Marco Regazzola, an employee of the claimant.  On the basis of such agreements, the respondent purchased such products, however at a high cost, for the purpose of expanding its position on the American market.  However, following refusal by the claimant to supply the polyurethane products at a low cost and the corresponding know-how, the respondent was obliged to sell certain products at a loss and eventually lost is customers, incurring damages;

v)    the claimant supplied formulas for the production of certain paints which were defective.  In particular, one white paint had a yellowing problem following exposure to light whilst one transparent paint became "milky white" following exposure to heat.  The claimant was allegedly aware of these problems prior to negotiations for the stipulation of the new license agreement but failed to warn the respondent of such problems, therefore deceiving it.  The occurrence of these defects, both prior to and following stipulation of the new license agreement, caused significant damages to the respondent, equal to US$ 450,123.24.

8.    Claimant's allegations

8.1    The claimant above all states that in its opinion the respondent did not raise any disputes in its answer pleadings concerning the specific credit items listed in its first Request for arbitration.  Therefore the respondent is no longer able to raise such disputes in the future as regards the credits listed under paragraph 4.1,

However the claimant claims there is no doubt as regards the grounds of its claims.

8.2    As regards the claim to set-off credits the claimant observes the following:

-    there has been no breach on its part of the new license agreement and of the agreement dated 26 May 1987.   The claimant always supplied the information and technical explanations requested by the respondent, including when the latter was in default of payment.   It merely threatened not to supply such information but never actually implemented its threats.   Therefore there are no damages;

-    there can be no claim for payment of a commission of 10% on royalties received by the claimant for similar agreements concerning Canada and Mexico, since:

  •   the claimant never stipulated a license agreement for these territories, which is a fundamental basis for claiming such commission;
  •   entitlement to such commission is however conditional upon the respondent not being in breach as regards payment of royalties due to the claimant, which condition was clearly not fulfilled;

-    the license agreement which took effect from 26 May 1987 was replaced by the subsequent agreement dated 1 January 1996, as shown by the letter dated 13 February 1995 from the respondent (document 21), such that the corresponding payments of royalties due pursuant to the previous license agreement ceased.   The claimant fails to understand which technologies it allegedly refused to supply.   The claimant claims that it always performed its obligations under the agreement.   Therefore there are no damages;

-    as regards the so called low cost polyurethane products, the claimant denies that the parties ever stipulated any agreement concerning such products and therefore in this case also there are no damages.   Further such products would no longer represent low cost products if supplied from Italy in view of transport and customs clearance costs.   On the contrary, the formulas for manufacturing such products were in the possession of the respondent;

-     all of the respondent's claims relative to defects in the formulas must be rejected for the following reasons:

- the claims deriving under the license agreement in effect from 26 May 1987 cannot be enforced in these arbitration proceedings since they are based on rights which differ from those the object of arbitration and due to lack of jurisdiction on the part of this arbitration court. If anything, such claims must be enforced by way of a different arbitration proceeding, in Milan, in accordance with the provisions of clause 17 of the license agreement in force from 26 May 1987;
- all of the claims are time-barred due to the delay in reporting defects;
- all of the claims deriving under the new license agreement cannot be enforced pursuant to the clause which exempts the claimant from liability (clauses 9.3), which only loses its effects in case of malicious fraud, which is denied by the claimant;

-     finally, damages enforced by the respondent have not been proven and in any case cannot be charged to the claimant.

8.3    The claimant also raised two pleas of a formal nature:

-     the respondent's answer and counter-claim is null and void since the lawyer who signed it does not have a valid power of attorney, and such situation cannot be rectified during the course of the proceeding;

-     the respondent's answer and counter-claim is inadmissible since it is drawn up in English whilst the arbitration clause (clause 9.4 of the license agreement) provides that the language of arbitration is Italian. Any plea and dispute raised by the respondent concerning the language in which arbitration should be held is too late, since made following delivery of the above-mentioned deed, in breach of Section 5/1, sub-paragraph e) of the ICC Rules of arbitration.

## III    RELIEF SOUGHT BY THE PARTIES

9    The <u>claimant</u> Basf has requested the following:

9.1     that the respondent's answer and counter-claim be declared null and void due to the absence of a power of attorney on the part of the lawyer who signed such document;

9.2     that the respondent's answer and counter-claim relative to the first Request for arbitration be declared inadmissible since it is drawn up in English rather than in Italian;

9.3     that the respondent Crown be ordered to pay the claimant US$ 406,294.89, plus interest accrued at 5% from the contractual due date of each individual invoice;

9.4     rejection of all credits which the respondent Crown requests are set-off, as regards the damages incurred and the quantity thereof.

9.5     that the respondent Crown be ordered to pay all arbitration costs, including repeatable costs

10     The respondent Crown has requested the following:

10.1    that all formal pleas raised by the claimant are rejected in full;

10.2    verification that the license agreement was terminated on 2 December 1998;

10.3    that consequently the request for payment of US$260,000.00 for minimum royalties for the period from 1.1.1999 to 31.12.2002 is rejected in full;

10.4    that the claimant Basf's claim equal to US$ 146,294.89 plus interest accrued at 5% from the contractual due date of each individual invoice for the period from 1.1.1996 to 31.12.1998 is set-off in full with Crown's credits equal to US$ 450,123.24;

10.5    subordinately, that all of Basf's claims, equal to US$ 406,294.89 plus interest accrued at 5%, from the contractual due date of each individual invoice, are fully set-off with Crown's credits, equal to US$ 450,123.24;

10.6    that the claimant Basf is ordered to pay all arbitration costs, including repeatable costs.

## IV.    PROCEDURE

11    The arbitration proceeding was commenced by Basf by way of a Request for arbitration dated 2 December 1998.  Crown formulated its answer on 1 April 1999.  The Terms of Reference prepared by the sole arbitrator were signed by the parties on 5/9/12 and 16 November 1999 and by the sole arbitrator on 16 November 1999.  The parties agreed, under paragraph 14 a) of the Terms of Reference, that the ICC Rules of arbitration would apply, in the version in force commencing from 1 January 1998.

12    The claimant Basf produced second pleadings on 2 June 1999; the respondent Crown on 15 December 1999.

On 27 January 2000 the claimant Basf produced third pleadings, limitedly with respect to the counter-claim brought by the respondent Crown.  On 28 February 2000 the claimant and on 1 March 2000 the respondent, produced their preliminary pleadings.  On 20 March 2000 the claimant Basf and on 22 March 2000 the respondent Crown, formulated their written observations to the counterpart preliminary pleadings.

13    On 8 June 2000 all witnesses were heard apart from one, and the respondent Crown was heard in the person of Mr. Carlos Rhys, whilst on the previous day the witness depositions were provided to the sole arbitrator, in the form of sworn statements rendered by witnesses resident in the USA.
On 29 September 2000 the last witness was heard whilst previously, on 4 August 2000, the respondent had  formulated a written claim for discovery of documents against the claimant.

14.1    On 17 October 2000, the sole arbitrator learnt that the claimant Basf had lodged a new Request for arbitration on 22 June 2000, concerning the minimum royalties for the period from 1 January 1999 to 31 December 2000, also requesting payment of minimum royalties for the period from 1 January 2001 to 31 December 2002 as soon as collectable.

14.2    The new Request for arbitration dated 22 June 2000 was, with the consent of the parties, consolidated with the previous arbitration proceeding,  pursuant to Section 19 of the ICC

Rules and following express agreement with the undersigned arbitrator on 27 November 2000.

Following consolidation, the respondent Crown produced an answer dated 17 January 2001. The claimant replied by way of pleadings dated 27 February 2001 and the respondent replicated by way of pleadings dated 8 May 2001.

On 22 November 2001, the claimant Basf formulated brief preliminary pleadings. By way of an order dated 12 February 2002 the application for discovery by the respondent was rejected.

On 16 April 2002 the claimant Basf and on 29 April 2002 the respondent Crown, produced their concluding arguments.


## V.     REASONING

### V.I     Formal pleas raised by Basf

15.1    The claimant has, during the proceeding, raised a plea of nullity of the answer from Crown due to lack of a power of attorney for the lawyer who signed such pleadings.

In fact, the answer dated 1 April 1999 did not include a document which showed proof of a power of attorney granted by Crown to counsel Mr. Haynsworth to represent it in this proceeding. A similar document, specifically the original of the written power of attorney dated 31 August 1999, complete with certified signatures, was sent on 1 September 1999 and received by the undersigned arbitrator on 10 September 1999, in execution of procedural order no.2. This order requested that Crown "*produce a power of attorney by which it appoints Mr. Knox L. Haynsworth, III, to represent it in this arbitration proceeding by 24 September 1999*".

15.2    By way of transmission of such document, Crown satisfied that requested by the arbitrator and resolved any doubts concerning the existence of a power of attorney between Crown and Mr. Haynsworth,

The power of attorney dated 31 August 1999 in fact declared that Crown "*has caused, constituted and appointed and by this deed causes, constitutes and appoints Knox L. Haynsworth III its true and lawful attorney, and grants said Knox L. Haynsworth III the*

*right to sign any deed.....[omissis] and to enforce any claim and any defense which may be enforced in this proceeding."*

The fact that the request for arbitration was sent to Crown but that the answer was prepared, signed and sent by counsel for the respondent Mr. Haynsworth provides proof, in view of the above-mentioned subsequent power of attorney, that the power of attorney for representation in this proceeding already existed at the time of signing the answer.

It is therefore unnecessary to verify whether a power of attorney granted subsequently has the effect of ratifying acts carried out previously in the absence of a power of attorney. This matter, which should be examined on the basis of law applicable to the principal and attorney, in the case in question the law of the State of South Carolina (see T. Rüede, R. Hadenfeldt, Schweizerisches Schiedsgerichtsrecht, 2a, ed., Zurich, 1993, page 59, paragraph 11 III.4) does not require further examination, since the documentation held with the court records proves the existence of a power of attorney since the date of preparation of the answer.

The request to declare that the answer is null and void due to the absence of a power of attorney is therefore rejected.

16.1    The claimant has requested that the respondent's answer be declared inadmissible as it is not prepared in the language in which arbitration is held, i.e. Italian, but in another language, i.e. English.

16.2    In this arbitration proceeding the language chosen by the parties is Italian as provided in the arbitration clause 9.4 of the new license agreement.

However, prior to appointing the undersigned arbitrator and to transmitting the answer, there was an exchange of correspondence between the parties and the International Court of Arbitration of the ICC concerning the language (letters dated 2 and 4 March 1999). The ICC did not issue a decision in order not to prejudice the future decision of the arbitrator in conformity with Section 16 of the ICC Rules of arbitration.

Consequently Crown decided to prepare its answer in the language with which it was most familiar, i.e. English.

The language of arbitration was established by way of the Terms of Reference signed in the first half of November 1999, whilst in the meantime:

- on 2 June 1999 the claimant introduced its reply to the counterparts answer;
- on 18 August 1999 the arbitrator, by way of order no. 2, established a term, expiring on 24 September 1999, for the respondent to produce a translation in Italian of its answer;
- on 24 September 1999 Crown produced the translation into Italian of its answer.

16.3    Therefore, aside from the fact that the language of arbitration, i.e. Italian, despite being the object of a previous contractual clause had not already been definitively established by way of the subsequent Terms of Reference, the claimant was able to defend itself and enforce its rights and arguments, as shown by way of its reply dated 2 June 1999, despite the fact that at such time the answer was only available in an English version. The fundamental rights of the claimant were therefore fully respected.

It should also be noted that the claimant itself, by way of its application for arbitration, produced a significant 18 documents, including the license agreement, all of which were in English and without any translation into Italian. This therefore demonstrates that it erroneously raised the plea of the inadmissibility of the answer which was not prepared in the language of arbitration and that it is perfectly able to understand English and to propose a reply (in Italian) to an answer in English.

The plea is therefore pure chicanery, and in truth is unworthy of proposal in any legal proceeding, but even less so in a proceeding for international arbitration before the ICC, particularly given that the claimant corresponded with the latter in English and continued to produce case documents in their original language, and therefore almost always in English. This plea is therefore rejected and requires no further comment.

VII    <u>The claim of inadmissibility of the counter-claims deriving under the license agreement dated 26 May 1987</u>

17.1    On 2 June 1999 the claimant Basf introduced its "Answer to the counter-claim". In chapter "*3. as regards the counter-claims formulated by the adversary*", having held that they are "*null or rather inadmissible*" (solely) because "*they are entirely generic and indeterminate*", the claimant formulated its observations on the merits. Paragraph 2 of such chapter 3 is entitled "*As regards failure to supply products and/or know-how relative to the license agreement, dated 26 May 1987, previously in force between the parties.*" Even in this paragraph the claimant did not hold that the credits deriving from the claimed breach could

not be set-off since they derived from the previous license agreement dated 26 May 1997, which contained an arbitration clause which, although referring to the ICC Rules of Arbitration of the ICC,  provided for arbitration in Milan rather than Lugano, therefore declaring that Italian law was applicable, rather than Swiss law, as in the subsequent new license agreement.

17.2    The claimant Basf signed the Terms of Reference on 6/16 November 1999. This document spoke of counter-claims (an inexact term), but gave no indication of any plea raised by Basf in the sense described above under paragraph 17.1.

What is more:

- the paragraph dedicated to applicable substantive law (paragraph 14.b)), explicitly states that "*As regards the counter-claims the applicable law is Italian law, limitedly in connection with the agreement entered into on 26 May 1987 (document B) in compliance with clause 17 thereof*", which clause not only concerns the applicable law but also constitutes an arbitration clause;
- in the paragraph dedicated to questions to be resolved (paragraph 17), under point IV the question is "*whether the counter-claims by the respondent actually exist and if so to what extent, what is the rate of interest which accrues, commencing from which date, and in respect of which partial amounts*".

17.3    Only by way of the "Answer to the Counter-claim" dated 27 January 2000, i.e. the last pleadings prior to the preliminary phase, did Basf for the first time raise the plea according to which the so-called "Counter-claims" could not be set-off, both as they arise under a different right from that the object of this proceeding, and because they are based on an agreement which contains an arbitration clause, with arbitration to take place in Milan.

18.1    Since this proceeding is held in Lugano, i.e. Switzerland, the provisions of Chapter 12 of the Federal Law concerning private international law (the "LDIP") are applicable pursuant to article 176 LDIP.
This means that, for any matters not governed by the ICC Rules of Arbitration, it is necessary to refer to Chapter 12 of the LDIP.

The matter of set-off in the context of an international arbitration proceeding is one of the most complex and discussed arguments in both doctrine and case law, and there is no single line of policy in favor of one solution rather than another.

The first difficulty lies in the identification of the law on the basis of which the relationship between jurisdiction and set-off must be analyzed, which question is further complicated by the fact that the institution of set-off has a duplicate nature, connected both to procedural law and to substantive law.  Where the former prevails, international procedural law applicable in the court in question applies; where the latter prevails the substantive law which governs the principal credit is applicable.

In this case it is not necessary to make this choice as both international procedural law for the court in question and substantive law governing the principal credit are governed by Swiss law.


18.2    The LDIP, contrary to the Inter-canton Agreement on arbitration dated 27 August 1969, does not deal with set-off.

This silence has given rise to various interpretations: there are those who hold that the absence of regulations prevents the arbitration court from issuing a decision in respect of set-off, those who state that the arbitration court is entitled to apply by analogy the rules set out by the Inter-canton Agreement on arbitration, and those who declare that the arbitration court is obliged to issued a decision concerning set-off.

In support of the former view it is stated that it is necessary to protect the claimant from having to defend itself against counter-claims deriving from different relations, in respect of which it has not agreed upon the (same) arbitration court.

In support of the third and most modern view, it is indicated that the aspect of substantive law according to which set-off constitutes a reason for extinguishing the principal credit must prevail over purely procedural aspects.

For a complete discussion of the situation according to doctrine and case law concerning set-off in arbitration proceedings please refer to Klaus P. Berger, Die Aufrechnung im Internationalen Schiedsverfahren, in RIW 1998/6, page 426 et seq; R Bonaznigo, Il nuovo Regolamento di arbitrato di Lugano; presentazione e temi scelti, in Il Ticino e il diritto, Raccolta di studi pubblicati in occasione delle Giornate dei giuristi svizzeri 1997, pag 99 et seq..

18.3    The undersigned arbitrator does not believe it necessary to choose one view point or another but rather believes that the characteristics of the case in question and the relationship between the principal credit and the credits submitted for set-off must be analyzed.

The principal credit derives under the new license agreement and is represented by royalties due from Crown.

The credits submitted for set-off derive, to the lesser extent, from the new license agreement and, to the greater extent, from the license agreement dated 26 May 1987. This latter agreement is none other than the "predecessor" of the new license agreement, as shown from a reading of the two agreements and by the letter from Crown dated 17 February 1995 (document 21): the rights granted are the same, the products the object of the two agreements are in general the same whilst the two principal reasons for the amendment to the agreement dated 16 May 1987 consist in a change to the territory and a change to the name of the sole licensee which remained, i.e. Crown (rather than Nova Industries Inc., Crown and C-N Financial Group). It is also important to stress that both agreements contain an arbitration clause in conformity with the Rules of the ICC.

The language of arbitration is the same (Italian) whilst the sole difference consists in the location of arbitration: Milan in the first agreement, Lugano in the second.

The new license agreement therefore represents, in many aspects, the almost natural continuation of the previous agreement, a kind of adaptation to developments in relations and the commercial requirements of the parties, who certainly did not intend to completely upset their collaboration or to revolutionize the rules which govern any disputes.

In consideration of all of these aspects, the concerns of whomsoever holds that the lack of any rules in the LDIP prohibits the arbitration court from issuing a decision in relation to the set-off of credits are overcome (see paragraph 18.2 above).

In the case in question, in view of the above-mentioned specific characteristics, it is necessary, due to the above-mentioned concrete aspects, to favor the solution according to which the arbitration court must reach a decision as regards set-off (as for example in ICC case no. 5971 published in the ASA Bulletin 1995, page 728-741).

18.4    The above is not the only reason pursuant to which the arbitrator believes that this solution is correct. In fact there are two other elements which permit or rather require the arbitration court to reach this conclusion:

- firstly, the fact that the claimant examined the merits of the credits enforced without having previously or contemporaneously disputed the jurisdiction of the court (see paragraph 17.1 above),

- secondly, the fact that the claimant signed the Terms of Reference without any reserve in this sense and since the latter speaks explicitly of counter-claims (an improper term) and the fact that Italian law applies thereto as set out in the arbitration clause in the license agreement dated 26 May 1987 (see above paragraph 17.2).

On the basis of article 186 paragraph 2 of the LDIP, applicable hereto for the reasons indicated above under paragraph 18.1, "*the plea of lack of jurisdiction must be proposed prior to any defense deed concerning the merits*". As reconfirmed by doctrine, whomsoever examines the merits without having previously raised such plea cannot subsequently raise it (see for example P. Lalive, J-F. Poudret, C. Reymond, Le droit de l'arbitrage interne et international en Suisse, 1989, Lausanne, ad article 186 LDIP, n. 11, page 383). Therefore, in the case in question, the plea raised by Basf only by way of the « Answer to the Counter-claim » dated 27 January 2000 is belated and must therefore be rejected.

The signing of the Terms of Reference produces the same result. In fact, paragraphs 14b) and 17.IV of the Terms of Reference leave no doubts as to the fact that the arbitration court is obliged to examine the counter-claims, whilst lack of jurisdiction of the arbitration court as regards the counter-claims is not in any way mentioned in the Terms of Reference and does not constitute a plea raised by either of the parties or a question in respect of which a decision should be issued. Consequently, the signing of the Terms of Reference containing the above-mentioned clauses represents an agreement by the parties to grant the undersigned arbitrator the power to reach a decision in relation to the claim to set-off credits.

18.5   In view of that set out under paragraphs 18.1-18.4, the solution adopted herein is therefore the most correct solution in all respects. Finally consideration should be taken of a practical matter which further supports this solution.

In the event that the claimant's arguments had been upheld, a new arbitration proceeding would have been commenced, in conformity with the ICC Rules for arbitration, with the sole difference that the location of such arbitration would be Milan rather than Lugano. The parties involved in the dispute would be identical. Therefore economic reasons and the need to avoid the risk of two conflicting award sentences, justify this solution.

## V.III   The claimant's credits

19.1   As already seen, the respondent does not dispute the claim by the claimant equal to US$ 146,294.89 plus interest accrued at 5%, for the period 1 January 1996 – 31 December 1998 (see paragraphs 4.1 and 10.4 above).  The respondent rather asks that such credit be set-off with its counter-claims of a greater value.

The respondent Crown disputes the existence of a further claim by Basf equal to US$ 260,000.00, concerning the period 1 January 1999-31 December 2002, (see paragraph 4.2 above), sustaining that the new license agreement was terminated with effect from 1 January 1999 (see paragraphs 5.2, 10.2 and 10.3 above).

19.2   The new license agreement has a duration from 1 January 1996 to 31 December 2002 (see clauses 1.4 and 2.1 of document 1).  Pursuant to clause 8.2, it may however be terminated in advance in case of breach of contract.   The mechanism provided for early termination described under clause 8.2 is the following: in case of breach of contract by a party, resulting in a sufficient cause for the other party to terminate the agreement, the other party may (but is not obliged) notify its intention to terminate the agreement to the party in breach, specifying the reasons.   In case of failure to rectify such breach within 30 days the agreement shall be considered terminated.

19.3   The respondent Crown claims that Basf activated such mechanism by way of letters dated 6 May, 9 June, and 16 July 1998 (documents 16, 17 and 18), and with the introduction of a request for arbitration on 2 December 1998.

A reading of these documents does not illustrate any course of action by which Basf notified its intention to terminate the agreement following breach of contract by Crown.  In all of these letters Basf solely requested payment of royalties due, reserving the right to take legal action for their recovery, by way of commencement of an arbitration proceeding.

It is true that commencement of a legal or arbitration proceeding can affect the form of specific contractual relations; however, in order to have similar effects the legal action must not conflict with specific rules which govern the contractual relations.

Or rather, in our case, the new license agreement provided for a mechanism for providing notice of termination which is precise and clear and requires explicit and unequivocal statements.  Where an agreement provides for written notice of the intention to terminate the

agreement, in case the party in breach has not rectified its breach, such notice must be explicitly give, which did not occur in this case. This is particularly true if one thinks that early termination of an agreement constitutes an extremely important act and also affects the party who is not in breach, which party is exclusively entitled to give notice.

Therefore the request to obtain payment of royalties fallen due, firstly by way of correspondence, and subsequently by way of commencement of the arbitration proceeding, cannot be deemed as anything other than that which it literally indicates; it cannot be assumed, as Crown states, that it results in an "*implicit statement of intention to terminate the agreement*".

19.4    The above is not in any way damaged by the fact that the claimant ceased to supply services and did not reserve the right to request payment of royalties not yet fallen due.

Firstly, in application of article 82 of the Code of obligations, in bilateral agreements, whomsoever requests performance must have already performed or at least offered to perform (unless such party is only obliged to perform at a later date); if not, such party cannot expect the other party to perform. In the case in question it does not appear that Crown ever acted in this manner and the latter did not even offer to deposit the minimum royalties, which were due in advance, pending resolution of other disputes.

Further there is no rule which obliges a creditor to reserve the right to request performance in respect of credits which have not fallen due, under penalty of immediate termination of the agreement and the consequent non-existence of the credits not yet fallen due. The respondent in fact, although it stresses failure by Basf to reserve the right to request payment of future royalties, does not mention any legal rule in support of such allegation, which is, in truth, audacious.

19.5    As shown by document SS the respondent Crown terminated the new license agreement by way of a letter dated 23 January 2001, addressed to Salchi. In view of the above, it is necessary to examine whether such agreement can actually be deemed as terminated by way of this unilateral declaration and if so, the date from which such termination takes effect. The question concerning whether or not the letter fulfils the formal requirements set out in clause 8.2 of the new license agreement can remain open. In fact, even in case of an affirmative response, it is necessary to verify whether the respondent was entitled to give notice in application of clause 8.2. According to such clause, only the party who is not in

breach can make recourse to such right, which corresponds with rules of law concerning breach of contract (articles 82 and 83 and article 97 et seq of the Code of obligations). In the case in question, in January 2001, the respondent Crown was years late in making payment of royalties fallen due and, as indicated above under paragraph 19.4, had never offered to perform its contractual obligations, by at least proposing to establish a guarantee deposit of the amounts due as royalties. Therefore it was in default as regards its contractual obligations and cannot therefore initiate the mechanism for termination as set out under clause 8.2, which process is exclusively reserved to the party not in breach.

19.6    Consequently, the license agreement cannot be considered as validly terminated even from the end of the period of 30 days following receipt of notice dated 23 January 2001. Therefore, in reference to that stated above under paragraphs 19.1-19.5, the credits of the claimant Basf for royalties accrued in the period 1 January 1999 – 31 December 2002, equal to US$ 260,000.00, must be recognized.

In conclusion, all principal credits on the part of the claimant must therefore be recognized.

19.7    As regards interest due at 5% per annum, the respondent has not disputed the fact that such amounts are due, commencing from the contractual due date of each individual invoice, limitedly with respect to the claimant's claim equal to US$ 146,294.89 concerning the period 1 January 1996 – 31 December 1998 (see paragraph 10.4 above).
Such default interest at a rate of 5% per annum should however be recognized in relation to Basf's further claim equal to US$ 260,000.00. In fact, in application of article 104 of the Swiss Code of obligations, "*a debtor in default of payment of a sum of money must pay default interest at a rate of 5 per cent per year*". The moment from which such interest falls due was established in the agreement under clause 3.3 of the new license agreement. However, given that the invoices relative to Basf's further claim of US$ 260,000.000 show payment dates which are subsequent to those contractually provided for in the new license agreement, default interest accrues commencing from the due date for payment of the invoice indicated by the creditor Basf on each individual invoice (as provided under article 102, paragraph 2 of the Swiss Code of obligations).

V.IV    Crown's claims submitted for set-off.

20.    The respondent Crown has enforced a series of damages incurred following alleged breaches of contract by Basf (see paragraph 7.2 above).  However save for damages connected to the "yellowing" and "milky white" problems, it has never quantified or proven the amount of such damages, to the extent that it even failed in its conclusions to establish a sum as regards damages incurred following the alleged breach set out under paragraph 7.2 i) (refusal to sell resin based products and to send related know-how), ii) (commissions on royalties received in Mexico and Canada), iii) (refusal to transfer technology and know-how for wood products) and iv) (refusal to supply low cost polyurethane products and related know-how).

Therefore, it is not necessary to further examine matters connected to the alleged breaches of contract set out above.  The only damages which require examination concern the yellowing and milky white problem, in respect of which Crown has enforced a counter-claim equal to US$ 450,123.23 (see paragraph 7.2 v above).

20    The damages allegedly caused due to the above-mentioned problems occurred in the period prior to entering into the new license agreement, i.e. both when the license agreement dated 26 May 1987 was still in force, and subsequently.  The respondent quantifies damages incurred in the period prior to entering into the new license agreement as US$ 366,153.29, of which US$ 298,443.84 due to "yellowing" (which only occurred in case of the client Heritage Doorcraft) and US$ 67,709.45 due to the "milky white" problem (which occurred with the clients Explorer Van and Brochstein's).  The damages incurred in the period following the signing of the new license agreement allegedly amount to US$ 83,969.95, all of which are due to the "milky white" problem.

21    Almost all of the witness depositions (both for the claimant and for the respondent) and an examination of the Crown representative, Mr. Rhys, showed that the problems linked to "yellowing", and to the "milky white" phenomenon, not only occurred but were communicated to Basf prior to entering into the new license agreement:

-    witness deposition of Mr. R. Schowengerdt:

"*Subsequently, I faxed Natale Colobmo of Salchi on April 17, 1995 (see Exhibit 2 attached) inquiring about wax polyester and specifically asked whether this polyester*

would *"have the same yellowing problem that direct gloss white has, or is this white polyester safe with respect to yellowing?"* Attached hereto as Exhibit 3 is the fax from Natale Colombo of Salchi the following day, April 18, 1995 in which he states that the wax polyester utilizing a *different resin* will not have the same yellowing problem as the direct gloss white (see page 3, paragraph 1);

*"During the week of May 21st of 1995 a representative of our company, Bob Kostelnik traveled to Europe for a lengthy meeting with various representatives of Salchi. Mr. Kostelnik met with Marco Regazzola and a number of technical people employed by Salchi, including Natale Colombo. Attached hereto as Exhibit 4 is a copy of page 4 of the trip summary of Bob Kostelnik, of which I received a copy, regarding his visit to Salchi where he addresses discussions with Salchi personnel concerning the yellowing of the Salchi white polyester top coat. As indicated in the attached Exhibit, he discussed this problem in detail and was advised by Salchi that the yellowing problem was so unpredictable and undefined that polyester should not be sold as white top coat* (see page 3, second paragraph).

- deposition of T. Chew:

*"Only after we had experienced claims by our customers were we made aware, in approximately the summer of 1995, that Salchi was aware that their white polyester formulation would yellow when applied not only to medium density fiberboard, but other substrates as well"* (see page 3, paragraph 1);

- deposition of F.Smittarello:

*"I believe that the yellowing problem occurred in 1994 or more probably in 1995"* (see page 1, last paragraph).

*"I even heard talk of problems linked to transparent paints used for furnishings in motor homes which became milky white. I think I heard talk of this in around 1995-1996* (see page 2, sentence 2);

- deposition of Mr. Marco Regazzola:

"*A year or a year and a half prior to becoming manager of the overseas department problems had arisen between Crown Metro and Salchi. There were complaints on the part of Crown Metro in relation to some products which "yellowed"; this certainly occurred in 1993/1994. I presume, but I cannot be certain, that similar complaints had also been made in 1992*" (see page 2, paragraph 2);

"*These problems arose commencing from 1993, when Crown Metro manufactured the products under license, applying our formulas and using resins supplied or recommended by us as the base product (for example Bayer). Salchi had also encountered analogous yellowing problems with the same family of products from the beginning of the 1990s; the problem was however little diffused, i.e. sporadic and we were unable to understand the scientific reasons for it* (see page 2, paragraph 3);

"*When I took over the overseas department in 1994, Crown Metro informed me that there was a yellowing problem; initially this was not a formal complaint.*"

"*In fact Mr. Rhys of Crown Metro came to Italy during 1995 in order to renew the license agreement; on such occasion he once again mentioned the problem of yellowing and showed official complaints made by Ashley against Crown Metro, which complaints indicated an amount of millions of dollars (*see page 2, paragraph 3);

"*A further problem with licensed products concerned the so-called "milky white" problem i.e. the milky effect on transparent paint applied inside Recreational vans constructed by General Motors. I believe this problem arose in 1995 since it was discussed following negotiation of the new license agreement but prior to signing of the same, which occurred in January 1996* (see page 5, paragraph 1);

-    deposition of C.Rhys:

"*By 1995 technical problems had arisen in connection with Salchi products, in particular in relation to white gloss paint which yellowed over time. By 1995 legal proceedings had been commenced against us in the USA due to this problem; there were other problems relative to the matter of "milky white" paint. Salchi was informed of these problems; in particular I spoke with Mr. Bardelli, Mr. Brenni and Mr. Regazzola* (see page 2, paragraph 2);

"*The most significant problems which arose with customers  occurred prior to 1996*" (page 2, paragraph 2)

*"By 1995 we had lost our customer Ashley; my attempts to win Ashley back in 1996 did not have the desired effects. Our customer Explorer Van was, I believe, lost at the end of 1995"* (see page 2, last phrase);

-    deposition of N. Colombo

*"As regards the milky white problem we had been in contact with Regazzola, who had taken car front risers for caravans to the laboratory. I think this occurred in around mid 1995"* (see page 2, paragraph 2).

As regards the yellowing problem this is evidenced by correspondence between the parties in the period between November 1994 and May 1995, attached to the deposition by R-Schowengerdt.

Therefore, problems linked to the yellowing problem and the milky white problem, including claims for millions of dollars brought against Crown by its customer Ashley (see statement of M.Regazzola, page 3 and examination of Mr. C. Rhys, page 2, cited above) and other legal proceedings, were well known to both Crown and Basf prior to entering into the new license agreement.

23.1    Given that the new license agreement was entered into following occurrence of these problems, when both the parties were aware of the existence of corresponding legal proceedings commenced by customers of Crown against the latter, it is particularly important to examine that which occurred during negotiations which led to stipulation of the new license agreement.

23.2    As regards the this point, only the witness Mr. M. Regazzola and the representative of Crown Mr. C Rhys made any comment.

Mr. Rhys admitted that:

-    *"When I negotiated the agreement in 1996, Crown Metro was already practically "out" of the American market of "van conversion" and "furniture"* and that his *"concern was*

*to find new markets"* (see examination of Mr. C Rhys, beginning of second half of page 2);

*"The agreement dated 1 January 1996 was signed for two main reasons. On the one hand we wished to extend the duration of the previous agreement, on the other hand we wished to resolve problems linked to any future commercial ventures in Canada and Mexico by Salchi, given that the agreement dated 1987 did not permit the latter to take action in these two territories"* (see examination of Mr. C. Rhys, top of page 2);

- by 1995 two of Crown's most important customers had been lost due to the above-mentioned problems (see examination of Mr. C. Rhys end page 3);

- *"After these set-backs, Crown Metro had to look to other sectors, abandoning the sector for furniture paints and paints for caravan furnishings, and concentrating on paints for musical instruments and other products"* (see examination of Mr. C. Rhys top of page 4).

It has therefore been verified that at the time of negotiations for the new license agreement, Crown was perfectly aware of the grave consequences caused by the yellowing and milky white problems, to the extent that in such period it was already assisted by counsel and insurance companies due to such problems (see examination of Mr. C. Rhys, page 2, end paragraph 2).

In fact, as confirmed by the representative of Crown Mr. C. Rhys, *"It was following these difficulties, during the negotiation of the agreement in January 1996, that a clause was stipulated whereby Salchi requested an exemption of liability in respect of any products manufactured by Crown Metro under license by Salchi and destined for the American market."* (see examination of Mr. C. Rhys half way down page 2).

Therefore Crown admits that the liability exemption clause in respect of Basf was introduced in order to avoid the latter being called by Crown to respond for future damages resulting, in particular, from the above-mentioned problems.

This was not the only consequence of the above-mentioned problems which led to changes to the new license agreement. As declared by the witness Mr. M. Regazzola, *"during negotiations in 1995 the parties obviously discussed the yellowing problem and complaints made by Ashley,"* and also *"given the difficulties encountered by Crown Metro, which had*

*even lost its customer Ashley, Salchi proposed the inclusion in the new license agreement of new and higher quality products, in particular water based products, offering Crown the possibility to open new markets and generate new turnover through these new products. Further we agreed that Salchi would make a direct attempt to recover the customer Ashley by way of direct exports"* see deposition of M. Regazzola, page 3, last paragraph).

This statement is perfectly in line with that declared by the representative of Crown Mr. C. Rhys and confirms that the parties intended to favor a commercial approach and solution rather than a legal solution to the problems pending during negotiations in 1995.

This is also confirmed by both Mr. Rhys:

*"Crown Metro decided not to bring a counter-claim even if its credit was greater than that of Salchi's since we always attempted to find a commercial rather than legal solution* (see examination of Mr. C. Rhys, page 4, paragraph 2).

and by Mr. Regazzola:

*"I remember that between renewing the agreement and signing it there was a period of "interregnum" during which we above all concentrated on working and initiating new projects"* (see deposition M. Regazzola, page 5, 3rd phrase).

23.3  With reference to the yellowing and milky white problems, extracts of the depositions set out above under paragraph 23.2 provide ample evidence of the situation during negotiations which led to the conclusion of a new license agreement and also demonstrate the interests of the parties.

Although:
- both parties were aware of the difficulties caused by the above-mentioned problems, in particular the loss by Crown of an important market sector and the cause of legal actions concerning millions of dollars pending against it;
- Crown was assisted by counsel and by its insurance companies in the USA;

the parties agreed on a commercial solution, stipulating a new license agreement and including new products, for the purpose of permitting Crown to conquer new market sectors and therefore to "set-off" or "recover" damages incurred. It should not in fact be forgotten that the agreement in force at such time would have expired on 26 May 1997, therefore two years later than the period of negotiations, and one and a half years later as compared to the effective date of the new license agreement, and the licensee was entitled to extend the agreement dated 26 May 1987 for a further 5 years (see clause 13). Therefore, even if the new license agreement did not so expressly state, the parties agreed to terminate the agreement in force in advance, to start from scratch and to recommence on a new basis, with new products. The best demonstration of this is the fact that Crown, by entering into the new license agreement, accepts the liability exemption clause set out under clause 9.3. To accept such a burdensome clause after having discussed with Basf problems relative to "yellowing" and "milky white" incidents and the legal and economic consequences in the US, can only mean that the parties decided to "forget" this set-back and look to the future. On the contrary there can be no doubt, in view of the legal procedures in the US and the losses incurred, that if Crown and Basf had not wished to "wipe the board clean" there would be some trace of Crown's claims against Basf and of the dispute which it caused. No documentary or witness evidence in this respect is contained in the records.

23.4    A confirmation of the fact that matters discussed and agreed by the parties in 1995 constituted a settlement agreement, even though it was not set out in a formal written deed, is given not only by the witness Mr. Regazzola, who declares: *"even if we did not formalize the settlement agreement for problems linked to the yellowing problem at the date of stipulating the new license agreement, there was a kind of tacit agreement and we never spoke of such problems again"* (see deposition for Mr. M. Regazzola, page 3, last sentence), but also by the representative of Crown Mr. C. Rhys, who, a year and a half after entering into the new license agreement, confirmed in a fax dated 10 July 1997 to Basf: *"We are trying very hard to overcome the setbacks that we faced on product liability. I must remind you that we have taken all losses without asking Salchi to accept any responsibility."* (see document H = G).

It may perhaps be surprising that no written settlement agreement was concluded but this is explained, both by the nature of relations existing between the parties, and by the absence of lawyers during the course of negotiations for the stipulation of the new license agreement,

which confirms the friendly relations between the parties and the reciprocal interest in forgetting the past and looking to the future.

Mr. Rhys in fact declared during questioning that *"The negotiation of the agreement in 1996 was extremely rapid given that there were friendly relations between the parties"* (see examination of Mr. C. Rhys page, two end of paragraph 1).

23.5    For all of the reasons listed above under paragraphs 23.2 to 23.4, the respondent Crown cannot set-off its credits deriving from possible breach by Basf of the license agreement dated 26 May 1987. This conclusion also applies to credits deriving from possible contractual breaches relative to the new license agreement. In fact, the yellowing and milky white problems, the sole reasons for which Crown enforced its claims against Basf, were known to both parties prior to stipulating the new license agreement and therefore prior to stipulating the liability exemption clause set out under clause 9.3. Crown therefore freely accepted this risk, in the knowledge that in the past such problems had occurred, and that they had not been resolved. Therefore it cannot now request to ignore clause 9.3

23.6    In view of the above it is not therefore necessary to verify whether the other grounds for admitting the possibility to set-off the credits claimed by Crown are fulfilled. However, it should be noted that almost all of the damages incurred by Crown have not been proven. Documentation held in the records includes many documents concerning claims by customers against Crown, but does not show that such claims have been recognized and paid by Crown (see document O-DD). Only document AA constitutes a settlement deed, although it is not signed, which shows a credit which Crown waived in order to settle a dispute. No witness evidence refers to these matters in any way, whilst the representative of Crown, Mr. C. Rhys rendered extremely incomplete evidence which alone cannot be held to be valid proof.

Therefore, even had the possibility to set-off the credits claimed by Crown been recognized, it would not have been possible to consider the amount of such credits as proven.

For the above-mentioned reasons the respondent Crown cannot set-off its credits enforced.

## VI    COSTS FOR THE ARBITRATION PROCEEDINGS AND REPEATABLE COSTS

24.1    It is a commonly accepted principle that the party which loses the proceeding must incur the costs of the arbitration proceeding, i.e. reimburse the winning party any amounts paid and indemnify the latter for legal expenses incurred.

However, in deciding on a division of such costs, the arbitrator is not bound by the application of rigid guide-lines but rather must consider all of the specific circumstances and is entitled to exercise a certain amount of discretion as provided under section 31 of the ICC Rules of arbitration.

Despite the outcome of the proceeding as regards the merits, it should be noted that all of the claimant's formal pleas were rejected as was the plea of lack of jurisdiction relative to the counter-claims enforced by the respondent in relation to the license agreement dated 26 May 1987.

Consequently the arbitrator is justified in ordering that 4/5 of the costs for the arbitration proceeding be borne by the respondent and 1/5 by the claimant.

24.2    The costs for the arbitration proceeding, including the costs and fees for the arbitrator and administrative costs for the ICC Secretariat, are established by the International Court of Arbitration as US$ 36,000.00

24.3    The respondent is also obliged to pay the claimant an indemnity for repeatable costs which also takes account of the considerations set out under paragraph 24.1 and of that set out in this respect by the claimant in its bill annexed to its concluding arguments.  Consequently Basf is recognized an indemnity for repeatable costs of 20,000.00 euros.

In consideration of the above,

following approval of this sentence award by the International Arbitration Court of the ICC in conformity with section 27 of the ICC Rules of Arbitration, version dated 01.01.1998,

in consideration that this arbitration has been effected in Lugano, Switzerland,

the sole arbitrator

<u>issues the following award sentence</u>

1.  Crown Metro Speciality Products Inc. is ordered to pay BASF Coatings S.p.A. the sum of US$ 406,294.89;

    Plus interest accrued at the official rate of 5% per annum:

    -   from 30.09.96 to 29.11.96 on US$ 2,716.46
    -   from 30.11.96 to 19.01.97 on US$ 17,833.37
    -   from 20.01.97 to 30.01.97 on US$ 32,390.37
    -   from 31.01.97 to 29.06.97 on US$ 54,954.37
    -   from 30.06.97 to 29.09.97 on US$ 70,499.37
    -   from 30.09.97 to 08.07.98 on US$ 86,294.89
    -   from 09.07.98 to 30.03.00 on US$ 146,294.89
    -   from 31.03.00 to 30.03.01 on US$ 266,294.89
    -   from 31.03.01 to 29.04.01 on US$ 326,294.89
    -   from 30.04.01 to 18.02.02 on US $ 336,294.89
    -   from 19.02.02 up to the date of payment on US$ 406,294.89.

2.  Costs for this arbitration proceeding, amounting to US$ 36,000.00 are borne by Crown Metro Speciality Products Inc for 4/5 and by Basf Coatings S.p.A. for 1/5.
    Therefore given that the claimant has already made an advance payment of US$ 25,000.00 the respondent is ordered to pay Basf Coatings S.p.A. as reimbursement of expenses for this proceeding, the sum of US$ 17,800.00

3.  Crown Metro Speciality Products is ordered to pay Basf Coatings S.p.A the sum of Euro 20,000.000 for repeatable costs.

the sole arbitrator

Lugano, 20 August 2002

(Franco Busa, lawyer)

signed